STOCKWELL, Plaintiff in error, v. STATE, Defendant in error.

*No. State 152. Argued May 2, 1973.—Decided June 5, 1973.*
(Also reported in 207 N. W. 2d 883.)

22

For the plaintiff in error there were briefs and oral argument by *Howard B. Eisenberg*, state public defender.

For the defendant in error the cause was argued by *Steven B. Wickland*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

HANLEY, J.   Two issues are presented on this appeal:

1. Is there sufficient credible evidence in the record to sustain a conviction for being a party to a masked armed robbery; and

2. Was the seventeen-year sentence imposed by the trial court an abuse of its discretion?

*Sufficiency of evidence.*

Defendant's first contention is that there was insufficient evidence presented at his trial for a jury to

find him guilty of aiding and abetting in the commission of the armed robbery. On appeal, the test for determining the sufficiency of the evidence which was set forth in *Bautista v. State* (1971), 53 Wis. 2d 218, 223, 191 N. W. 2d 725, and has been restated most recently in *Bowden v. State* (1973), 57 Wis. 2d 494, 495, 204 N. W. 2d 464 which is as follows:

" 'Several rules applied in appellate review of the sufficiency of the evidence in criminal cases have been stated so frequently in our late cases that they need no citation of authority to support them. The burden of proof is upon the state to prove every essential element of the crime charged beyond reasonable doubt. The test is not whether this court or any of the members thereof are convinced beyond reasonable doubt, but whether this court can conclude the trier of facts could, acting reasonably, be so convinced by evidence it had a right to believe and accept as true. A criminal conviction can stand based in whole or in part upon circumstantial evidence. The credibility of the witnesses and the weight of the evidence is for the trier of fact. In reviewing the evidence to challenge a finding of fact, we view the evidence in the light most favorable to the finding. Reasonable inferences drawn from the evidence can support a finding of fact and, if more than one reasonable inference can be drawn from the evidence, the inference which supports the finding is the one that must be adopted. Our review of the record in response to a challenge to the sufficiency of the evidence is so limited by these rules.' "

Quoting from *State v. Nutley* (1964), 24 Wis. 2d 527, 554, 555, 129 N. W. 2d 155, this court in *Taylor v. State* (1972), 55 Wis. 2d 168, 197 N. W. 2d 805, at page 177, reviewed the requirements for conviction of being a party to a crime under sec. 939.05, Stats. [1]

---

[1] "939.05 Parties to crime. (1) Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although he did not directly commit it and although the person who directly com-

" '. . . Under the complicity theory of sec. 939.05 (2) (b), a person is liable for the substantive crime committed by another if (1) he undertakes conduct (either verbal or overt action) which as a matter of objective fact aids another person in the execution of a crime, and further if (2) he consciously desires, or "intends" that his conduct will yield such assistance. He must consciously direct his conduct toward the realization of the criminal objective. He must have a "stake in the outcome."

" 'However, it is not necessary that the aider and abettor enter into an agreement with the perpetrator to assist him in consummation of the crime. Nor is it necessary that the perpetrator be aware of the accomplice's efforts, in order to hold the accomplice liable for the substantive crime. . . .' "

At about 1:15 a. m. on the morning of September 9, 1971, three men, all wearing silk stockings over their heads, appeared in the side entrance of Cham's Tap in the town of Mt. Pleasant in Racine county. They ordered that the 15 or so patrons place their billfolds on the bar and then proceeded to empty both the cash register and safe; enforcing their demands with the handguns which two of them carried. Effecting their escape, the robbers first crowded everyone into the kitchen and then fired several shots into the walls as they exited.

David Miller, the state's principal witness and an accomplice in the robbery, testified that on the night of the robbery, he was in a car with Gary Kasprovich, Dale Vorlob, Danny Hagerman, Scott Allen and the defendant, parked near Cham's Tap.

Miller stated that after Kasprovich and Hagerman told the rest of the group that they wanted to rob the tavern

mitted it has not been convicted or has been convicted of some other degree of the crime or of some other crime based on the same act.

"(2) A person is concerned in the commission of the crime if he:

"(a) Directly commits the crime; or

"(b) Intentionally aids and abets the commission of it; or . . ."

an argument broke out among everyone and the defendant said "he wanted no part of it." With the argument over, they then drove to Hagerman's where they picked up the stockings that were later used and then drove back and stopped down a block from the tavern.

Miller further testified that another argument broke out and that he and the defendant without being told by anyone went into the tavern to have a beer and talked there for about five to ten minutes. Miller stated that when he got back into the car someone asked him what he saw and he responded that there was a money bag lying on a counter and that there were about 15 patrons. Miller stated that at this point, the defendant said: "Yah, looks like a winner down on the other end of the bar." Kasprovich, Vorlob and Allen then got out of the car and pulled the stockings over their heads and that one of them took a gun from the glove compartment. Prior to this, the defendant had moved from the back seat so that he was now sitting on the console between the two front bucket seats. When someone asked him for the gun that was in the console, "he just stood up a little bit, opened the console and handed him the gun."

After the crime, they went to Milwaukee where they checked into a motel, whereupon they proceeded to divide up the money. Miller testified that although he didn't see money being given to the defendant, he had earlier testified in direct examination that "everyone got money."

In *Taylor, supra,* at page 178, this court reviewed other cases where it was also alleged that the defendant's involvement was insufficient to sustain a conviction for aiding and abetting:

"In *Carter v. State* (1965), 27 Wis. 2d 451, 134 N. W. 2d 444, 136 N. W. 2d 561, a conviction of armed robbery was sustained where the defendant was the driver of the getaway car and shared in the proceeds.
". . .

"The court then referred to other cases which upheld convictions where the defendant acted as a lookout. *Fifer v. State* (1926), 189 Wis. 50, 206 N. W. 861; *State v. Kuick* (1948), 252 Wis. 595, 32 N. W. 2d 344. *In these cases, credible testimony placed the defendants at the scene of the crime under circumstances from which it could be inferred that they had knowledge of the plan and the function they were to serve."* (Emphasis added.)

On the basis of this record, a reasonable inference could have been drawn by the jury that the defendant was in fact "casing" the tavern. This supporting role played by the defendant made him guilty under the law as a principal participant.

*Abuse of discretion in sentencing.*

Upon his conviction of being a party to the crime of armed robbery while masked in violation of secs. 939.05 (1), 943.32 (1) (b), (2) [2] and 946.62,[3] Stats.; the defendant was sentenced to an indeterminate term of not more than seventeen years in the Wisconsin state prison.

---

[2] "943.32 **Robbery.** (1) Whoever, with intent to steal, takes property from the person or presence of the owner by either of the following means may be imprisoned not more than 10 years:

"(a) By using force against the person of the owner with intent thereby to overcome his physical resistance or physical power of resistance to the taking or carrying away of the property; or

"(b) By threatening the imminent use of force against the person of the owner or of another who is present with intent thereby to compel the owner to acquiesce in the taking or carrying away of the property.

"(2) *Whoever violates sub. (1) while armed with a dangerous weapon may be imprisoned not more than 30 years."* (Emphasis added.)

[3] "946.62 **Concealing identity.** Whoever commits a crime while his usual appearance has been concealed, disguised or altered, with intent to make it less likely that he will be identified with the crime, *may in addition to the maximum punishment fixed for such crime, in case of conviction* for a misdemeanor be imprisoned not to exceed one year in county jail, and in case of conviction *for a felony be imprisoned not to exceed 5 years."* (Emphasis added.)

Although seventeen years represents less than one half of defendant's maximum potential exposure, he, nevertheless, contends that it represents an abuse of the trial court's discretion and that this court should appropriately modify it.

The attorney general contends that defendant's motion for modification of sentence is not made under compelling circumstances and is, therefore, not reviewable.

Analogizing to sec. 974.02, Stats., of the new criminal code which allows ninety days for the bringing of a motion for a new trial, this court in *Hayes v. State* (1970), 46 Wis. 2d 93, 175 N. W. 2d 625, adopted a like period to commence on the date of sentencing for a motion to modify a sentence. In *Farley v. State* (1971), 50 Wis. 2d 113, 115, 183 N. W. 2d 33, this court stated that:

". . . failure to present a motion at the trial court level to review a sentence bars the defendant from raising a question of impropriety as to sentence except under compelling circumstances . . . ."

The sentencing in this case was on May 11, 1972, with the time for making a *Hayes* motion expiring on August 9, 1972. The state public defender was appointed to represent the defendant on July 7, 1972, and the trial transcript was not even filed in the trial court until August 2, 1972. The defendant further submits that the record and transcript were not received by the public defender until August 7th and even at that time, the presentence report was not a part of the record and had to be subsequently requested. The presentence report did not arrive until September 7, 1972, several weeks after the ninety-day period had expired.

In *Whitmore v. State* (1973), 56 Wis. 2d 706, 203 N. W. 2d 56, this court, although reiterating the rule laid down in *Farley* decided to review the propriety of the sentence there imposed. The stated justification was the time lag which exists between when the duties of

trial counsel cease and those of appellate counsel begin, with this court specifically mandating that trial counsel's duties continue until such time as the defendant decides whether to appeal immediately or undertake any post-conviction motions that might be desirable. This case represents the type of situation which *Whitmore* attempts to rectify and consequently this court will review defendant's sentence.

In support of his contention that the trial court abused its discretion in sentencing, the defendant argues that neither his prior background nor the degree of his involvement with the crime support a seventeen-year sentence, and that this sentence is much harsher than the typical sentence imposed in such circumstances.

The first of the defendant's contentions, namely, that his record of prior involvement with the law does not support the length of his imprisonment, rests on the ground that *Neely v. State* (1970), 47 Wis. 2d 330, 177 N. W. 2d 79, and other Wisconsin cases relating to the use of presentence reports have been recently overruled by the United States Supreme Court in *United States v. Tucker* (1972), 404 U. S. 443, 92 Sup. Ct. 589, 30 L. Ed. 2d 592, and *Loper v. Beto* (1972), 405 U. S. 473, 92 Sup. Ct. 1014, 31 L. Ed. 2d 374.

In *Neely*, certain juvenile court appearances, subsequently set aside pursuant to *In re Gault* (1967), 387 U. S. 1, 87 Sup. Ct. 1428, 18 L. Ed. 2d 527, were made a part of the pre-sentence report considered by the court in sentencing.

Referring to *Waddell v. State* (1964), 24 Wis. 2d 364, 368, 129 N. W. 2d 201, and *Deja v. State* (1969), 43 Wis. 2d 488, 493, 168 N. W. 2d 856, respectively, this court in *Neely, supra,* at page 335 found no prohibition in a trial court's reliance on defendant's juvenile record despite the fact that his juvenile appearances contained a *Gault* defect.

"In insuring a broad scope of inquiry in presentence investigations, this court has held that even complaints as to other offenses may be brought to the trial court's attention as 'evidence of a pattern of behavior.' We have no hesitancy in holding that the juvenile record of the defendant, as presented, was properly before the court as such evidence of a pattern of behavior. The defendant cites as controlling a recent United States Supreme Court case [*Burgett v. Texas* (1967), 389 U. S. 109, 88 Sup. Ct. 258, 19 L. Ed. 2d 319] that dealt with the use in an information of an invalid conviction as a basis for a charge of violation of a repeater statute. In the present case, the prior commitments were not used to increase the sentence under a repeater statute, but were used as information related to sentencing after a valid conviction had been secured."

In *United States v. Tucker, supra,* the court of appeals for the Ninth Circuit had found that although the defendant's prior convictions rendered invalid under *Gideon v. Wainwright* (1963), 372 U. S. 335, 83 Sup. Ct. 792, 9 L. Ed. 2d 799 [4] had in no way contributed to the finding of guilty in the instant prosecution, it, nevertheless, remanded the case for re-sentencing since "there was a reasonable probability that the defective prior convictions may have led the trial court to impose a heavier prison sentence than it otherwise would have imposed." *Tucker v. United States* (9th Cir. 1970), 431 Fed. 2d 1292, 404 U. S. at page 445. The high court granted certiorari to the government who argued in the exercise of wide discretion of a federal district judge in sentencing ". . . his relevant inquiry is not whether the defendant has been formally convicted of past crimes, but whether and to what extent the defendant *has in fact* engaged in criminal or antisocial conduct." 404 U. S. at page 446.

---

[4] In *Gideon,* the high court concluded that due process in state courts ". . . required that an adult have the right to the assistance of counsel at the critical stage of trial in a criminal prosecution." *State ex rel. La Follette v. Circuit Court* (1967), 37 Wis. 2d 329, 336, 155 N. W. 2d 141.

Rejecting the government's arguments and affirming the Ninth Circuit, the court, at page 449, stated:

"The *Gideon* case established an unequivocal rule 'making it unconstitutional to try a person for a felony in state court unless he had a lawyer or had validly waived one.' *Burgett v. Texas*, 389 U. S. 109, 114. In *Burgett* we said that '[t]o permit a conviction obtained in violation of *Gideon v. Wainwright* to be used against a person either to support guilt or enhance punishment for another offense . . . is to erode the principle of that case.' *Id.*, at 115. Erosion of the *Gideon* principle can be prevented here only by affirming the judgment of the Court of Appeals remanding this case to the trial court for reconsideration of the respondent's sentence."

Subsequent to the *Tucker* decision, the court in *Loper v. Beto, supra*, was confronted with a situation where a defendant in a Texas criminal court had his credibility impeached on cross-examination by the use of prior convictions "constitutionally tainted" by *Gideon*. Concluding that such impeachment was prohibited with retroactive effect, the court, at page 483, stated:

"Unless *Burgett* is to be forsaken, the conclusion is inescapable that the use of convictions constitutionally invalid under *Gideon v. Wainwright* to impeach a defendant's credibility deprives him of due process of law."

While *Loper* concerned itself with the use of an invalid conviction to support guilt rather than to increasing sentencing, as in *Tucker*, the high court was likewise impressed with the fact that at the time of Loper's conviction, Texas juries were authorized with absolute and unreviewable discretion to impose sentence. For his alleged guilt of the crime of statutory rape of his eight-year-old stepdaughter, the jury gave Loper fifty years in prison, prompting the court to conclude:

"Thus, bringing the prior convictions to the attention of the jury may well also have served to enhance Loper's punishment." 405 U. S. at page 482.

Since their adoption, both *Tucker* and *Loper* have been followed numerous times by state courts,[5] though in no instance was it asserted that the rationale of *Tucker* and *Loper* similarly applied to juvenile appearances rendered invalid by *Gault*. While the state contends that these recent pronouncements of the high court relate to right to counsel under *Gideon,* not *Gault,* this court made it quite clear in *State ex rel. La Follette v. Circuit Court, supra,* that the right to counsel was enjoyed equally by juveniles as well as adults, thereby giving *Gault* retroactive effect in Wisconsin. At pages 336, 337, this court stated:

"In *Gideon v. Wainwright* the United States Supreme Court decided that due process required that an adult have the right to the assistance of counsel at the critical stage of trial in a criminal prosecution. This decision has been given retroactive effect by the United States Supreme Court.

"While state courts have divided as to whether *Gault* should be given retroactive effect, *we consider the better reasoned decisions are those which accord Gault retroactive effect.*

"*In Gault the court made it very clear that the juvenile's right to counsel at the delinquency hearing is as crucial as the adult's right to counsel at trial.*" (Emphasis added.)

Therefore, it would follow that to whatever extent *Neely* and other cases of this court permitting judges to consider in sentencing pre-*Gault* juvenile adjudications where juveniles were denied the right to counsel, even

---

[5] *Wood v. State* (Tex. Crim. App. 1972), 478 S. W. 2d 513; *McComb v. State* (Tex. Crim. App. 1972), 488 S. W. 2d 105; *Madeley v. State* (Tex. Crim. App. 1972), 488 S. W. 2d 416; *State v. Koch* (1972), 118 N. J. Super. 421, 288 Atl. 2d 295; *Gatewood v. State* (1972), 15 Md. App. 450, 291 Atl. 2d 688; *Clenney v. State* (1972), 229 Ga. 561, 192 S. E. 2d 907; *Wilburn v. State* (Ark. 1972), 487 S. W. 2d 600; *State v. Miller* (1972), 108 Ariz. 303, 497 Pac. 2d 516.

to the extent of showing a pattern of conduct, they are to that extent expressly overruled by *Tucker* and *Loper*.

In the instant case, defendant's pre-sentence report consists of 18 separate entries over a period of ten years from 1955 to 1965 and, for the most part are *contacts* with the juvenile court rather than *adjudications*.

From the record, it is impossible to determine what, if any, *Gault* rights, particularly that of counsel, were violated in the course of these contacts.

In the case at bar, the defendant was tried, convicted and sentenced in 1972, five years after *Gault* and five years after right to counsel mandate was made retroactive by this court. We conclude that in the case at bar, the county court was aware that any *adjudications* which were contained in the report could not be considered in its sentence and this fact is manifest by the fact that at no time in the process of explaining its sentence did the trial court ever refer to defendant's juvenile or adult record, despite the fact that his adult record contained several misdemeanor convictions and that the last entry on his juvenile record was for auto theft for which he spent two years in Green Bay Reformatory.

What the trial court did consider was the gravity of the crime and defendant's involvement in it. After discussing the seriousness of the acts committed, the trial court stated:

"There is no difference from the defendant Stockwell's conduct and Scott Allen's conduct. Conduct like that isn't divisible. You have got to take the conduct in totality of the crime."

Defendant contends that his minor involvement reflects a low degree of culpability and that the trial court did not consider this in accordance with *McCleary v. State* (1971), 49 Wis. 2d 263, 182 N. W. 2d 512, where this court at page 275 stated:

"The legislature intended that individual criminals, though guilty of the same statutory offense, were not necessarily to be treated the same but were to be sentenced according to the needs of the particular case *as determined by the criminals' degree of culpability and upon the mode of rehabilitation that appears to be of greatest efficacy.*" (Emphasis added.)

Although the defendant did not himself go into the tavern or fire a shot, it is evident that the jury concluded that by his initial entry into the bar "for a beer" and his subsequent statement that there was a "real winner" there, he was "casing" it for his cohorts who were to follow.

This court, in *Carter v. State* (1965), 27 Wis. 2d 451, 454, 455, 134 N. W. 2d 444, 136 N. W. 2d 561, discussed a defendant's contention that he was guilty at most of robbery rather than armed robbery, as he played a minor role without a gun. The responsibility of one who aids and abets was pointed out by this court at page 455, citing *State v. Henger* (1936), 220 Wis. 410, 264 N. W. 922, wherein the court stated that although the defendant "remained in the automobile, did not wield a revolver or actively participate in the fight which resulted in the death, his guilt was no less in degree than he who shot the filling-station attendant." In this case, in imposing sentence, the trial court said that there was no difference between this defendant's conduct and that of the men who actually entered the tavern and fired the shots which could have injured the patrons and employees of the tavern.

The crime in which the defendant participated is a most serious one. It involved the masked armed robbery of fifteen patrons of the tavern. The patrons and employees were placed in fear of their lives by the discharge of firearms as the robbers effected their escape.

We are satisfied that in the instant case, there is no showing of any abuse of discretion by the trial court

and this case is far from the "unusual cases" in which the power to review and modify sentence should be exercised. *Cheney v. State* (1969), 44 Wis. 2d 454, 171 N. W. 2d 339, 174 N. W. 2d 1.

*By the Court.*—Judgment affirmed.